Fox Rothschild LLP
William H. Stassen
Dana S. Katz
101 Park Avenue, 17th Floor
New York, New York 10017
(212) 878-7900

*Counsel to Tracy Klestadt, Plan Administrator of
the bankruptcy estate of Choxi.com, Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE: | Chapter 11 |
| CHOXI.COM, Inc., | Case No. 16-13131-SCC |
| Debtor. | |
| TRACY KLESTADT, in his capacity as Plan Administrator of the estate of Choxi.com, Inc., | |
| Plaintiff, | Adv. No. 18- |
| -against- | |
| DEEPAK AGARWAL, MELINA AGARWAL F/K/A MELINA ASH, SHEELA AGARWAL, VIPESH AGARWAL, VISHAL AGARWAL, IFTIKAR AHMED, DANIEL DEPINA, DIYA IRREVOCABLE TRUST, DEPINA CONSULTING, LLC, AND TECHSYS MARKETING, INC. | |
| Defendants. | |

## COMPLAINT

Tracy Klestadt (the "Plaintiff" or "Plan Administrator"), in his capacity as Plan

Administrator of Choxi.com, Inc., a/k/a Nomorerack.com, Inc., the above-captioned debtor

("Choxi" or the "Debtor"), by and through his counsel, Fox Rothschild LLP, hereby files this

Complaint (the "Complaint") against Deepak Agarwal, Melina Agarwal f/k/a Melina Ash, Sheela

Agarwal, Vipesh Agarwal, Vishal Agarwal, Iftikar Ahmed, Daniel Depina, DIYA Irrevocable Trust, Depina Consulting, LLC, and Techsys Marketing, Inc., (collectively, the "Defendants"), and in support thereof avers as follows.

## NATURE OF THE ACTION

1.     This is an action brought by the Plan Administrator against certain of the Debtor's former officers and directors, other individuals and entities seeking to remedy their violations of law, including breaches of fiduciary duties and receipt of fraudulent and preferential transfers, among other claims, that have caused substantial monetary losses to the Debtor and other damages.

## JURISDICTION AND VENUE

2.     This Court has subject matter jurisdiction over this adversary proceeding pursuant to 11 U.S.C. § 157(a) and 28 U.S.C. § 1334(b).  This matter is a core proceeding under 28 U.S.C. §§157(b)(2)(A), (C), (F), (H) and (O).

3.     The Court has jurisdiction over Defendants named herein because Defendants all regularly transact and conduct business in the State of New York.  Moreover, this Court has personal jurisdiction over Defendants under Bankruptcy Rule 7004.

4.     In addition, each of the Defendants' conduct, which is the subject of this Complaint, took place in New York.

5.     Venue is proper in this district under 28 U.S.C. §§ 1408 and 1409(a) because this proceeding arises in a case under the Bankruptcy Code pending in this district.

## PARTIES

6.     Plaintiff is Tracy Klestadt, in his capacity as the Plan Administrator for the Debtor's bankruptcy estate.  The Plan Administrator maintains offices at Klestadt Winters Jureller Southard & Stevens, LLP, 200 West 41st Street, 17th Floor, New York, New York, 10036.

7.     The Debtor is a Delaware corporation and its principal place of business was in New York.

8.     Defendant Deepak Agarwal ("Deepak") was the Debtor's Chief Executive Officer, the founder of the Debtor and a member of the Debtor's board of directors, and upon information and belief resides at 100 Barclay Street, Apt 29A, New York, NY 10007.  Deepak Agarwal is an insider of the Debtor under 11 U.S.C. § 101(31).

9.     Defendant Melina Agarwal f/k/a Melina Ash ("Melina Agarwal") was the Debtor's Chief Merchandising Officer and is the wife of Deepak Agarwal, and upon information and belief resides at 100 Barclay Street, Apt 29A, New York, NY 10007.  Melina Agarwal is an insider of the Debtor under 11 U.S.C. § 101(31).

10.    Defendant Sheela Agarwal was a member of the Debtor's board of directors, upon information and belief, is the sister of Deepak Agarwal, and upon information and belief resides at 100 Barclay Street, Apt 15M, New York, NY 10007.  Sheela Agarwal is an insider of the Debtor under 11 U.S.C. § 101(31).

11.    Defendant Vipesh Agarwal ("Vipesh") was the Debtor's Chief Operating Officer, a member of the Debtor's board of directors, and upon information and belief, is a relative of Deepak Agarwal.  Upon information and belief, Vipesh Agarwal resides in Canada.  Vipesh Agarwal is an insider of the Debtor under 11 U.S.C. § 101(31).

12.    Defendant Vishal Agarwal ("Vishal") was the Debtor's Executive Vice President, Chief Marketing Officer, a member of the Debtor's board of directors, and upon information and belief, is a relative of Deepak Agarwal.  Upon information and belief, Vishal Agarwal resides at 605 W. 42nd St., PH 29H, New York, NY 10036.  Vishal Agarwal is an insider of the Debtor under 11 U.S.C. § 101(31).

13.     Defendant Iftikar Ahmed[1] ("Ahmed") was a member of the Debtor's board of directors and upon information and belief has a last known address of 505 North Street, Greenwich, CT 06830. Iftikar Ahmed is an insider of the Debtor under 11 U.S.C. § 101(31).

14.     Defendant Daniel Depina ("Depina") was the Debtor's Chief of Customer Service, and upon information and belief, resides at 14103 Wake Robin Drive, Brooksville, FL 34604. Daniel Depina regularly worked for Choxi in New York.

15.     Upon information and belief, defendant DIYA Irrevocable Trust (the "DIYA Trust") is a trust created for the benefit of defendants Deepak Agarwal and Sheela Agarwal and is domiciled in the state of New York. DIYA Trust is an insider of the Debtor under 11 U.S.C. § 101(31).

16.     Defendant Depina Consulting, LLC ("Depina Consulting") is a Florida limited liability company owned by defendant Daniel Depina that provides consulting services and has a principal place of business and registered agent located at 14103 Wake Robin Drive, Brooksville, FL 34604. Upon information and belief, Depina Consulting regularly transacts and conducts business in the state of New York.

17.     Upon information and belief, defendant Techsys Marketing, Inc. ("Techsys") is a Philippine corporation that provides customer service and has a principal place of business located at Alicante Tower Sumulong hi-way, Marikina City, Philippines 1800. Upon information and belief, Techsys regularly transacts and conducts business in New York.

---

[1] Deepak Agarwal, Sheela Agarwal, Melina Agarwal, Vipesh Agarwal, Vishal Agarwal and Iftikar Ahmed are hereinafter referred to as the "D&O Defendants."

## STATEMENT OF FACTS

## I.     Procedural Background And The Debtor's Bankruptcy Filing

18.     On November 10, 2016 (the "Petition Date"), an involuntary petition (the "Involuntary Petition") under Chapter 7 of Title 11 of the U.S. Code (the "Bankruptcy Code") was filed against the Debtor in the U.S. Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") by Sanders Collection Inc., Consumer Shipping Inc. and Elite Brands Inc.

19.     On December 5, 2016, the Debtor filed its answer to the Involuntary Petition by filing a voluntary petition under Chapter 11 of Title 11 of the Bankruptcy Code.

20.     On December 9, 2016, the Court entered an Order for Relief converting the case to a case under chapter 11 of the Bankruptcy Code.

21.     On December 15, 2016, the Official Committee of Unsecured Creditors (the "Committee") was duly appointed by the Office of the United States Trustee pursuant to 11 U.S.C. § 1102.

22.     On December 18, 2017, the Bankruptcy Court entered its Order Confirming Debtor's Chapter 11 Plan of Liquidation (the "Plan") and Granting Related Relief (the "Confirmation Order," Docket No. 173).

23.     Pursuant to Section 7.2 of the Plan, the effective date of the Plan occurred on January 2, 2018 (the "Effective Date").

24.     By the Confirmation Order, the Plan Administrator was appointed and authorized to take all steps reasonably necessary to effectuate and fulfill the provisions in the Plan. *See* Confirmation Order at 2.

25.     Under the Plan, as of the Effective Date, the Plan Administrator has authority to

"assert, prosecute or settle all Causes of Action[2] and/or Avoidance Actions belonging to the Estate." *See* Plan, Exhibit A to Confirmation Order (Docket No. 173) at § 5.1.

## II.     **The Debtor's Business**

26.     The Debtor was founded in 2010 (then known as NoMoreRack.com) by defendant Deepak Agarwal, who was the Debtor's chief executive officer and a member of its board of directors.

27.     The Debtor was an online retailer offering discount brand name and non-brand name merchandise, including bed and bath goods, home décor, kitchenware, furniture, watches, jewelry, apparel, electronics and computers, sporting goods, and designer accessories, among other products.

28.     The Debtor sold these products through its internet website www.choxi.com.

29.     In 2011, the Debtor's sales were $9 million and rose to approximately $340 million in 2013.

30.     However, in October 2016, approximately one month before the Involuntary Petition was filed, the Debtor was forced to cease its operations as a result of operating losses ranging from $7.4 million to $21 million annually.

## III.    **Oak Investments**

31.     Oak Investment Partners is a venture capital firm that has invested $9 billion in over 500 companies around the world.

### A.  **The 2012 Series A Funding**

32.     On November 13, 2012, the Debtor closed a $10 million investment in its Series A

---

[2]     The Plan defines "Causes of Action" to mean "any and all Claims, rights, actions, chose in action, suits, causes of action, liens, judgments and damages belonging to the Debtor or its Estate, . . ." which includes this adversary proceeding. *See* Plan, Exhibit A to Confirmation Order (Docket No. 173) at § 1.22.

financing round (the "Series A Funding") in which it issued Series A Redeemable Convertible Preferred Stock at a purchase price of $0.881312 per share (the "Series A Purchase Price"). *See* Series A Preferred Stock Purchase Agreement (the "Series A Agreement").

33.     Oak Investment Partners and one of its portfolio companies, Giosis Holdings, Incorporated ("Giosis"), led the Series A Funding round.

34.     On November 12, 2012, the Debtor's board of directors at the time approved the Series A Funding in a Unanimous Written Consent. *See* November 12, 2012 Action by Unanimous Written Consent of the Board of Directors of NoMoreRack.com, Inc. (the "Series A Board Consent").

35.     The Series A Board Consent was signed by Deepak Agarwal.

36.     In the Series A Funding, Oak Investment Partners invested $150,000 through its portfolio company, Giosis.   *See* Series A Agreement, Schedule A.

37.     The Series A Agreement required that the Debtor use the proceeds of the Series A Funding for expansion of its sales, marketing, research and development and general corporate purposes and working capital. *Id*. at ¶ 1.3.

38.     This investment by Oak Investment Partners through Giosis allowed Oak Investment Partners to access the Debtor's confidential operational and financial information, which in turn, allowed Oak Investment Partners to be better informed for a planned Series B investment.

39.     The Series A Agreement permitted the Series A investors to appoint two directors to the Debtor's Board.

40.     Pursuant to the Series A Agreement, Oak Investment Partners appointed one of its general partners, defendant Iftikar Ahmed, to the Debtor's board of directors, which furthered Oak

Investment Partners' access to internal confidential information about the Debtor.

41.     Upon information and belief, Ahmed had been employed by Oak Investment Partners since 2004.

42.     In addition to the investment by Oak Investment Partners' portfolio company, Giosis, I-Cubed Domains, LLC also invested $2 million as part of the Series A funding.

43.     Upon information and belief, Ahmed held a personal interest in I-Cubed Domains, LLC and the Series A Funding constituted an insider transaction.

44.     The D&O Defendants failed to adequately investigate, become informed about monitor, understand and/or supervise the Series A Funding and failed to uncover Ahmed's personal interest in I-Cubed Domains.

**B.  The 2012 Series A Supplemental Funding**

45.     Days after the Series A investment closed, Ahmed began to demand that Giosis be permitted to invest an additional $2 million (the "Supplemental Series A Funding") for Ahmed to remain on Choxi's board of directors and Oak Investment Partners to stay actively involved in Choxi.

46.     Moreover, it was insisted that the new investment had to be at the same valuation as the Series A financing, likely because a new valuation would have been materially higher due to Choxi's successful holiday sales.

47.     Use of this prior valuation allowed the Oak Investment Partners portfolio company to reap an immediate benefit from the purchase of additional Series A shares.

48.     Ahmed – a member of the Debtor's board – actively pushed the Debtor to engage in a self-dealing, insider transaction and the D&O Defendants complied.

49.     Thus, on November 26, 2012, the Debtor and Giosis entered into the Supplemental Series A Preferred Stock Purchase Agreement (the "Supplement Series A Agreement").

50.     Notably, Ahmed, a general partner of Oak Investment Partners and a member of the Debtor's board of directors, signed the Supplemental Series A Agreement on behalf of Giosis.

51.     Accordingly, the Supplemental Series A Funding was also an insider transaction.

52.     Moreover, the Supplemental Series A Agreement was approved by the Debtor's three board members at the time, including defendants Ahmed and Deepak Agarwal.  *See* November 26, 2012 Action by Unanimous Written Consent of the Board of Directors of Nomorerack.com, Inc.

53.     Upon information and belief, Ahmed did not recuse himself from the Debtor's decision to enter into the Supplemental Series A Funding.  Rather, he participated on both sides of the transaction and Deepak Agarwal permitted this despite a clear conflict of interest.

54.     Under the Supplemental Series A Agreement, Giosis purchased the additional Series A shares at the Series A Purchase Price.  *See* Supplemental Series A Agreement at ¶ 1.1.

55.     Even worse than the conflict of interest, Ahmed had falsely represented the facts surrounding the purchase of the additional $2 million of Series A shares.

56.     Rather, Ahmed opened an account in Giosis' name from which he made both Series A investments, and only the $150,000 investment had been approved by Giosis.

57.     Ahmed subsequently paid back the $2 million to Oak's portfolio company in June 2013.

58.     By the time that the funds were re-paid to Giosis in June 2013, the $2 million investment was worth more than $10 million, as explained below.

59.     Indeed, Ahmed kept the Choxi stock, which continued to appear to be owned by Giosis on the Choxi stock register and the D&O Defendants failed to understand or make themselves knowledgeable about the underlying facts surrounding the Supplemental Series A Funding and other transactions detailed herein.

60.     The D&O Defendants failed to properly investigate, become informed about, monitor, understand and/or supervise the Supplemental Series A Funding and failed to uncover the true purpose of this transaction.

### C. The 2013 Series B Funding

61.     At the time that the Series A Funding closed, it was understood that there would be a subsequent Series B funding (the "Series B Funding") that would also involve Oak Investment Partners.

62.     Ahmed was Oak Investment Partners' and its affiliates' lead on the Series B Funding.

63.     On July 15, 2013, Ahmed temporarily resigned from the Choxi board of directors to lead the negotiations on behalf of the Series B investors and act on behalf of Oak Investment Partners and its affiliates with respect to the impending Series B Funding.

64.     Ahmed reached out to potential Series B investors and arranged for the hiring of Morgan Stanley as exclusive placement agent to find an additional investor.

65.     However, Morgan Stanley subsequently withdrew from the Series B Funding and thereafter, very few potential investors were contacted.

66.     Choxi ultimately received letters of intent from three potential investors.

67.     Rather than negotiating with all three potential investors, Ahmed steered the discussion to Accel Partners, and the D&O Defendants allowed him to lead the Debtor's search

for funding despite that he had resigned from the Debtor's board and was acting for the benefit of himself and Oak Investment Partners. Thus, each of the D&O Defendants abdicated their responsibilities and duties to the Debtor to identify the best investor for Choxi.

68.     Accel Partners ultimately signed a term sheet in or about June 2013 by which Accel and Oak Investment Partners would each invest $25 million. Notably, the term sheet did not allow for secondary purchases (*i.e.*, the Series A investors, including Giosis, could not sell their shares as part of the Series B investment).

69.     However, after conducting due diligence, Ahmed informed the Series A investors that Accel had decided to pass on the deal.

70.     Upon information and belief, Ahmed engineered Accel's decision to pass on the Series B funding because the Accel term sheet did not allow for the sale of the Series A shares that were believed to be owned by Giosis but in reality owned by Ahmed.

71.     Thereafter, it was represented to the Debtor that Oak Investment Partners would participate in the Series B Funding with a $25 million investment only <u>if</u>, among other things, Choxi would re-purchase Giosis's Series A Shares (which were, in actuality, owned by Ahmed) because Oak Investment Partners had a policy (the "<u>Oak Policy</u>") prohibiting it from investing in Choxi at a different valuation level than its portfolio company had invested in Choxi.

72.     For example, on August 13, 2013, Ronak Khichadia (a member of the Debtor's board) explained in an email that he had been "going back and forth with Ifty [Ahmed] on this. Oak has to have giosis sell if they r the only institutional investor in series b." Ahmed responded on August 14, 2013 agreeing that Mr. Khichadia understood his position.

73.     Upon information and belief, the Oak Policy did not exist and was represented to the Debtor in order to further the fraudulent scheme.

74.     On October 18, 2013, the Debtor and the Series B investors executed the Series B Preferred Stock Purchase Agreement (the "Series B Agreement").

75.     By the Series B Funding, an Oak Investment Partners affiliate, Oak Investment Partners XIII, LP ("Oak Fund") invested $25 million in Choxi and NMR E-Tailing LLC invested $15 million.  *See* Series B Agreement, Schedule A.

76.     The Series B Funding was approved by Choxi's board of directors in an Action by Unanimous Written Consent by the Board of Directors of NoMoreRack.com, Inc. (the "Series B Board Consent"), signed by defendants Deepak Agarwal and Vipesh Agarwal.

77.     The Series B Agreement, like the Series A Agreement, required that the proceeds of the Series B Funding be used for the expansion of Choxi's sales and marketing, research and development and working capital.  *Id.* at ¶ 1.3.

78.     However, the Series B Agreement also provided for the "repurchase of a warrant to purchase shares of Common Stock held by Giosis. . . ."  *Id.*

79.     Further, the Series B Agreement required that the Debtor and Giosis have executed the Giosis Repurchase Agreement (defined below) – which had been one of the terms that the Debtor understood to have been required by Oak Investment Partners.  *Id.* at ¶ 4.17.

80.     The Amended and Restated Voting Agreement (the "Amended Voting Agreement") dated October 18, 2013 and entered into in connection with the Series B Funding changed the size of the Debtor's board of directors to seven (7) members and also changed the board composition.  *See* Amended Voting Agreement, ¶¶ 1.2, 1.3.

81.     The Amended Voting Agreement permitted Oak Fund and its "Affiliates" to designate one director, who was initially Ahmed.  *Id.* at 1.3(a).

82.     Importantly, the Amended Voting Agreement also permitted "Key Holders" (as defined in the Amended Voting Agreement) to appoint four (4) directors to the Debtor's board, who were initially, Deepak Agarwal and 3 of his relatives – defendants' Vipesh Agarwal, Sheela Agarwal and Vishal Agarwal – effectively transferring control of the Debtor's board back to its CEO, defendant Deepak Agarwal. *Id.* at ¶ 1.3(c).

83.     The Series B Board Consent explicitly approved this expansion of the board and change to its composition. *See* Series B Board Consent at ¶ 5.

84.     Also on October 18, 2013, Choxi entered into the Repurchase Agreement with Giosis (the "Giosis Repurchase Agreement"), which was signed by Ahmed on behalf of Giosis. *See* Repurchase Agreement.

85.     By the Repurchase Agreement, the Debtor agreed to "repurchase" from Giosis the Series A shares purchased by Giosis in connection with the Series A Funding for the aggregate purchase price of $10,896,193.59. *Id.* at ¶ 1.

86.     The Series B Board Consent reveals certain of the representations made to the Debtor by Ahmed.

87.     Indeed, the Series B Board Consent explains that "**Oak has required**, as a condition to its purchase of Series B Preferred Stock in the Series B Financing, that the Company [the Debtor] enter into a certain Repurchase Agreement . . . with Giosis . . . pursuant to which the Company shall repurchase from Giosis . . . shares . . . for an aggregate purchase price of $10,896,193. . . ." *See* Series B Board Consent at ¶ 7 (emphasis added).

88.     Upon information and belief, just days before the Series B Funding closed, Ahmed opened a bank account in the name of Giosis.

89.     Upon information and belief, the $10,896,193.59 used to repurchase the Giosis Series A shares that were actually owned by Ahmed was received into a Giosis account created and controlled by Ahmed.

90.     Upon information and belief, Ahmed thereafter transferred the funds into a joint bank account held with his wife.

91.     The D&O Defendants failed to properly investigate, become informed about, monitor, understand and/or supervise the Series B Funding and failed to uncover the true nature of the transaction.

92.     As a result of the D&O Defendants' failures, the repurchase of these shares resulted in approximately $10.9 million being diverted from the Debtor to Ahmed during this insider transaction (the "Ahmed Transfer").

**D.  The Post-Series B Funding Efforts**

93.     After the close of the Series B Funding, the Debtor began efforts to close a transaction for a sale or strategic funding, such as a Series C funding.

94.     However, during the same time period, the Securities Exchange Commission announced a lawsuit against Ahmed, which followed its indictment of Ahmed for insider trading in April 2015.

95.     At this time, the D&O Defendants failed to take action to remove Ahmed from the Debtor's board of directors or take any other action to separate Ahmed from Choxi in order to protect, including but not limited to, Choxi's future profitability, goodwill and reputation in the e-commerce industry.

96.     Not only did the D&O Defendants fail to investigate and become informed of the events related to the transactions between the Debtor, Oak Investment Partners and/or Ahmed at

the time that they occurred, the D&O Defendants similarly failed to take action when the SEC brought the egregious nature of these transactions to light in the public.

97.     These events negatively impacted Choxi's Series C financing efforts, which ultimately failed.

98.     In April 2015, Ahmed was also criminally charged by indictment in the U.S. District Court for the District of Massachusetts.

99.     On April 30, 2015, Oak Investment Partners XIII, LP informed the Debtor, that pursuant to the Voting Agreement, it was removing Ahmed as its appointed director.

100.    On May 6, 2015, the SEC brought a civil action against Ahmed (and his related entities) directly related to his role with Oak Investment Partners, including related to Choxi.

101.    Given the egregious nature of Ahmed's actions related to Choxi and other entities, the D&O Defendants' failures to properly investigate, become informed about, monitor, understand and/or supervise Ahmed's actions with respect to Choxi are even more damaging.

102.    Not only did the D&O Defendants failures result in the diversion of $10.9 million dollars among other damages, they also prevented any opportunity for Choxi to enter into a subsequent Series C funding and damaged Choxi's future as a go forward entity.

103.    The D&O Defendants knew or should have known of the true nature of the transactions with Oak Investment Partners and/or Ahmed, and to the extent that they failed to make themselves knowledgeable about these events, the D&O Defendants are complicit in the damages incurred by the Debtor.

IV.     **Defendants Caused Choxi to Use Techsys For Customer Service, Resulting In Millions Of Dollars In Damages To the Debtor**

104.    Historically, the Debtor used a company called Elco Services ("Elco") for customer service.

105.     During that time, Elco invoices were sent by defendant Daniel Depina (Choxi's Chief of Customer Service) directly to Rohit Lalwani, the Debtor's Vice President of Finance at the time, for payment.

106.     In January 2014, the Debtor entered into the Services Agreement with Techsys (the "Techsys Agreement"), and, upon information and belief, members of the Agarwal family had a relationship with Techsys prior to 2014.

107.     The Techsys Agreement provided that compensation to Techsys would be for a "maximum fee of $125,000 per month." *See* Techsys Agreement at § 3.

108.     After the Debtor began to utilize the services of Techsys, Depina began to send invoices to defendant Vipesh Agarwal (the Debtor's COO and a member of its board) instead of sending them to Mr. Lalwani.

109.     Upon information and belief, Vipesh would review and mark-up the invoices by increasing the amount due, and then forward Techsys invoices to Mr. Lalwani for payment, causing the Debtor to overpay Techsys by millions of dollars (the "Techsys Scheme").

110.     There were various discrepancies between the invoices received from Depina and the subsequent Techsys invoices generated by Vipesh Agarwal.

111.     For example, the headcount of customer service agents listed on invoices widely varied from month to month, ranging from 24 to 262 agents.

112.     Further, average monthly cost per customer service agent was much higher on the invoices prepared by Vipesh Agarwal (averaging $767) than on those provided by Depina (averaging $519).

113.     Because of these mark-ups, the Debtor regularly paid Techsys well in excess of the maximum contractually monthly fee of $125,000.

114.    For example, the December 2014 Techsys invoice totaled $633,100 and the January 2015 Techsys invoice totaled $528,100.

115.    This overbilling continued month after month despite the clear maximum fee set forth in the Techsys Agreement.

116.    From July 2014 through the Petition Date, the mark-up discrepancies totaled approximately $4.27 million.

117.    Upon information and belief, the marked-up invoices generated by Vipesh Agarwal were done to benefit the Agarwal family, including defendants Deepak, Melina, Sheela, Vipesh and Vishal Agarwal, and also Mr. Depina.

118.    Upon information and belief, Deepak Agarwal and/or his relatives and/or controlled Techsys, and accordingly, the Debtor's transactions with Techsys constitute insider transactions.

119.    Upon information and belief, Techsys was set up in the Philippines by an individual named Lesley who served as Choxi's point of contact to Techsys.

120.    Lesley emailed Vipesh Agarwal and explained that "all incorporators [of Techsys] are members of my family and we did this to help you set up the corporations."

121.    Moreover, Lesley also advised – when certain large transfers to Techsys were frozen by authorities – that "[d]eepak [Agarwal] has an anti money laundering case abroad."

122.    During the time period in question, there were also various other services billed to the Debtor by Techsys, to benefit Defendants, that were not needed by the Debtor and often duplicative of services the Debtor provided for itself, including, for example, marketing services.

123.    For example, the Debtor was billed for unidentified IT projects, affiliate marketing and weekly email triggers, among other items that were not needed or utilized by the Debtor.  The

amounts paid by the Debtor for these unneeded and, upon information and belief, unperformed services was $3,999,000.

124. Deepak Agarwal and Vipesh Agarwal deliberately utilized the Debtor's relationship with Techsys to siphon funds from the Debtor. These actions resulted in the Debtor overpaying Techsys and paying for duplicative, unperformed or unneeded services that total approximately $8 million in damages to the Debtor (the "Techsys Overbilling Damages").

125. The remaining D&O Defendants and Dan Depina / Depina Consulting ignored the scheme in place with respect to the Debtor's relationship with Techsys and failed to properly investigate, become informed about, monitor, understand and/or supervise the Debtor's relationship with Techsys.

126. In total, the Debtor paid Techsys $12,128,767 from January 2012 through the Petition Date (the "Techsys Transfers").

127. Due to the gross overbilling and improper mark-ups, the Debtor did not receive reasonably equivalent value or fair consideration in exchange for the Techsys Transfers.

128. The D&O Defendants each breached their fiduciary duties to the Debtor by failing to make themselves knowledgeable about the Techsys Scheme, and, when they learned of the Techsys Scheme, by failing to keep all of the Debtor's directors and officers properly informed and by failing to prevent the Techsys Scheme from harming Choxi.

## V. Defendants Paid Themselves Exorbitant Salaries And Failed To Adequately Perform Their Duties As Officers And Directors Of Choxi

129. Deepak Agarwal received an annual salary of $360,000 as the Debtor's CEO and board member.

130. However it was well known within Choxi that Deepak was non-responsive to the needs of the Debtor and not reachable and often failed to perform his duties as CEO.

131.

132.    From 2012 through the Petition Date, Deepak Agarwal received $1,241,878.59 in salary and expense reimbursements (the "Deepak Transfers").

133.    Deepak breached his fiduciary duties to the Debtor by receiving the Deepak Transfers when he was not providing services to the Debtor in return.

134.    Deepak Agarwal failed to provide adequate consideration or reasonably equivalent value in exchange for his receipt of the Deepak Transfers.

135.    Vishal Agarwal received an annual salary as $300,000 as the Debtor's Chief Marketing Officer and a member of its board.

136.    When Choxi's operations began to suffer, Choxi's marketing budget was severely decreased and/or omitted.  Upon information and belief, at that time, Vishal Agarwal had very little role at Choxi and did not perform his duties as Chief Marketing Officer, and yet continued to collect his exorbitant salary.

137.    Moreover, during his employment at Choxi, Vishal founded a startup called Itsacheckmate.com Inc. related to a web application and began pursuing his start-up full time while still employed by and collecting a salary from Choxi.

138.    As early as November 2015, Vishal was using his Choxi email address to work on his start-up and, upon information and belief, prior to that time often failed to adequately perform his duties as an officer and director.

139.    Deepak Agarwal and Vipesh Agarwal, and likely other of the Defendants, were well aware of Vishal's efforts related to his start-up and failures to perform his duties as Choxi's Chief Marketing Officer and a member of the Debtor's board.

140.     For example, at one point, Deepak even asked Vishal via email to "keep the app confidential among [Choxi] staff and Choxi related people.  Would not like people to get the wrong idea that your primary attention and focus is on the app instead of Choxi."

141.     From 2012 through the Petition Date, Vishal Agarwal received $728,440.74 in salary (the "Vishal Transfers").

142.     Vishal breached his fiduciary duties to the Debtor by receiving the Vishal Transfers when he was not providing services to the Debtor in return.

143.     Vishal Agarwal failed to provide adequate consideration or reasonably equivalent value in exchange for his receipt of the Vishal Transfers.

144.     Similarly, Vipesh Agarwal collected a $330,000 annual salary from Choxi for his position as Chief Operating Officer and a member of the Debtor's board.

145.     Upon information and belief, Vipesh Agarwal was the face of Choxi to its suppliers, and when Choxi's operations began to suffer, Vipesh Agarwal failed to communicate with suppliers causing further damage to the Debtor, abandoned his duties as COO and was generally unresponsive to Choxi and its employees.  During these times when Vipesh Agarwal failed to perform his duties as COO of Choxi, he continued to collect his exorbitant salary.

146.     Moreover, upon information and belief, at times, Vipesh Agarwal was out of the country in India and also participated in the start-up created by his brother, Vishal Agarwal, failing to perform his employment duties but still collected his exorbitant salary.

147.     From 2012 through the Petition Date, Vipesh Agarwal received $688,644.76 in salary (the "Vipesh Transfers").

148.     Vipesh breached his fiduciary duties to the Debtor by receiving the Vipesh Transfers when he was not providing services to the Debtor in return.

149.     Vipesh Agarwal failed to provide adequate consideration or reasonably equivalent value in exchange for his receipt of the Vipesh Transfers.

150.     In addition, Melina Agarwal was paid an annual salary of ranging from $150,000 to $220,000 for her position as the Debtor's Chief Merchandising Officer.

151.     Upon information and belief, Melina Agarwal was acting at the direction of her husband, Deepak Agarwal, and not in the best interests of Choxi.

152.     Upon information and belief, Melina's position at Choxi was another method by which she and her husband, defendant Deepak Agarwal, were able to siphon cash from the Debtor.

153.     From 2012 through the Petition Date, Melina Agarwal received $496,492.20 in salary (the "Melina Transfers").

154.     Melina Agarwal failed to provide adequate consideration or reasonably equivalent value in exchange for her receipt of the Melina Transfers.

**VI.     The DIYA Trust Was A Means For Deepak Agarwal And Sheela Agarwal To Improperly Siphon Cash From The Debtor**

155.     Upon information and belief, the DIYA Trust is a trust for the benefit of defendants Deepak Agarwal, the Debtor's CEO and a member of its board of directors, and his sister, Sheela Agarwal, who served on the Debtor's board of directors.

156.     Upon information and belief, Deepak and Sheela Agarwal utilized the DIYA Trust as a method to siphon funds from the Debtor for their personal benefit.

157.     From 2012 through the Petition Date, the Debtor paid $525,000 to the DIYA Trust, for the benefit of Deepak and Sheela Agarwal (the "DIYA Transfers")[3].

_____

[3] Together, the Deepak Transfers, Vishal Transfers, Vipesh Transfers, Melina Transfers and DIYA Transfers are collectively referred to as the "Agarwal Family Transfers."

158.     Upon information and belief, the DIYA Trust did not provide reasonably equivalent value or fair consideration to the Debtor in exchange for the receipt of the DIYA Transfers.[4]

159.     Upon information and belief, the DIYA Transfers were insider transactions designed to benefit DIYA, Sheela Agarwal and Deepak Agarwal and were not arm's length transactions.

160.     Upon information and belief, the D&O Defendants were aware of the relationships between DIYA and Sheela and Deepak Agarwal and ignored red flags about the DIYA Transfers causing damages to the Debtor and its creditors.

161.     Upon information and belief, defendants Sheela and Deepak benefited from the DIYA Transfers and/or were the immediate or mediate transferees of such transfers.

## VII.     The Agarwal Defendants Used Their Positions At Choxi For Their Personal Benefit, Endangering And Damaging Choxi

162.     Deepak, Melina, Sheela, Vipesh and Vishal Agarwal engaged in a variety of wrongdoing and mismanagement that harmed the Debtor.

163.     In addition to the conduct described throughout this Complaint, for example, just a few months before the Debtor's involuntary petition was filed, the D&O Defendants sold Choxi proprietary and confidential company email lists to a customer of Choxi, USA Dawgs, Inc. ("USA Dawgs") for far below market value.

164.     The USA Dawgs transaction is referenced in a pleading filed by USA Dawgs in Choxi's chapter 11 case.  *See* Docket No. 19 (Objection and Affidavit).

---

[4] DIYA Trust, Deepak or Sheela Agarwal may assert that the DIYA Transfers were repayment of a purported loan. To the extent that they assert the DIYA Trust provided a loan to the Debtor, upon information and belief, such purported loan was in fact an infusion of equity or capital.

165.    In August 2016, the Chief Executive Officer of USA Dawgs, Steven Mann, contacted Deepak Agarwal to purchase the portion of Choxi's customer list that was relevant to USA Dawgs.  *See* Docket No. 19-1 (the "Mann Aff.") at ¶ 7.

166.    Mr. Mann had "several conversations with officers of Choxi.com" regarding this potential transaction.  *Id*. at ¶ 8.

167.    Thereafter, Deepak Agarwal agreed to a deal with USA Dawgs wherein Choxi's account payable to USA Dawgs was reduced by $125,000 in exchange for the sale of 125,000 Choxi customer records and email contacts that had purchased USA Dawgs' products on Choxi's website.

168.    Choxi did not receive any payment or cash in exchange for these customer records.

169.    Moreover, Deepak was explicitly informed by Choxi's general counsel that the transaction was not legally permissible due to customer privacy concerns.

170.    Upon information and belief, this sale of Choxi's proprietary customer information was well-below market value and not done for the benefit of the Debtor.

171.    Upon information and belief, the D&O Defendants failed to investigate, become informed about, supervise, monitor or understand the types of transactions orchestrated by Deepak Agarwal and other D&O Defendants and/or turned a blind eye, permitting these transactions to continue despite causing substantial damages to the Debtor.

## VIII.    Depina Consulting And Daniel Depina Were Grossly Overpaid

172.    In 2012, the Debtor entered into a Services Agreement with Depina Consulting (the "Depina Agreement") for Depina Consulting to provide a full-service customer service program for Choxi.

173. The Depina Agreement provided for a fee to be paid to Depina Consulting of $8,000 per month.

174. However, month after month the Debtor regularly paid Depina Consulting far in excess of this contracted amount.

175. In total, from 2012 through the Petition Date, the Debtor paid Depina Consulting $653,826 (the "Depina Transfers").

176. The Debtor did not receive reasonably equivalent value or fair consideration in exchange for the Depina Transfers, particularly with respect to the amounts in excess of the contracted $8,000 per month.

177. Upon information and belief, defendant Daniel Depina benefited from the Depina Transfers and/or was the immediate or mediate transferees of such transfers.

178. The D&O Defendants failed to investigate, become informed about, monitor and supervise the Debtor's payment of Depina Consulting and/or Daniel Depina and permitted gross overpayment, damaging the Debtor.

## IX. The Debtor Was Insolvent During The Relevant Period

179. At the time that the Debtor entered into all of the transactions set forth in this Complaint, the Debtor was insolvent in that its total liabilities exceeded the fair value of their assets and/or were rendered insolvent as a result of these transactions.

180. The Debtor did not receive reasonably equivalent value or fair consideration in exchange for the transfers and transactions detailed herein.

## REQUEST FOR RELIEF

181. The Plan Administrator's investigation is ongoing and therefore the Plan Administrator reserves the right to: (i) supplement this Complaint with information and additional

alleged fraudulent and preferential transfers and causes of action that may become known as a result of further investigation; and (ii) seek recovery of such additional claims and transfers that are uncovered as a result of further investigation.

## COUNT ONE
### Breach of Fiduciary Duties
### (Against All D&O Defendants)

182.    The Plan Administrator repeats and re-alleges the allegations contained in all of the preceding and following paragraphs of this Complaint as if the same were fully set forth herein at length.

183.    At all relevant times, each of the D&O Defendants was either an officer, director and/or person in control of the Debtor.

184.    As directors, officers and/or persons in control of the Debtor, the D&O Defendants each owed fiduciary duties of care and loyalty to the Debtor and the Debtor's creditors.

185.    The D&O Defendants engaged in a variety of self-dealing transactions to benefit themselves and failed to investigate, become informed about, monitor and supervise the Debtor's business relationships, causing millions of dollars in damages to the Choxi.  For example, the D&O Defendants caused and allowed the Debtor to (i) enter into several rounds of financing that resulted in the diversion of at least $10.9 million from the Debtor (the Ahmed Transfer), among other damages; (ii) incur the Techsys Overbilling Damages totaling approximately $8 million; (iii) engage in the Techsys Transfers totaling approximately $12.1 million; (iv) engage in the Agarwal Family Transfers totaling approximately $3.7 million; (v) enter into the USA Dawgs transaction for far below market value; and (vi) engage in the Depina Transfers (collectively, the "Breaches of Fiduciary Duties").

186.     To the extent that any of the D&O Defendants did not directly cause the Debtor to engage in the Breaches of Fiduciary Duties, they ignored the Breaches of Fiduciary Duties and allowed the Debtor to be gravely damaged.

187.     These actions damaged the Debtor and ultimately resulted in far less value being available to the Debtor and its unsecured creditors in the Debtor's bankruptcy proceedings.

188.     The D&O Defendants' Breaches of Fiduciary Duties, including their duties of loyalty and care, directly and proximately caused the unnecessary dissipation and diversion of the Debtor's assets.

189.     The D&O Defendant's Breaches of Fiduciary Duties to the Debtor directly and proximately caused the Debtor and the Debtor's creditors to be deprived of assets that would have otherwise been available to them in the underlying bankruptcy case.

190.     As such, the Plan Administrator seeks compensatory damages as against each of the D&O Defendants in an amount to be determined at trial.

**COUNT TWO**
**Avoidance and Recovery of Constructive Fraudulent Transfers – 11 U.S.C. §§ 544(b), 548(b), 550 and 551**
**(Against all Defendants)**

191.     The Plan Administrator repeats and re-alleges the allegations contained in all of the preceding and following paragraphs of this Complaint as if the same were fully set forth herein at length.

192.     During the two years prior to the Petition Date, the Debtor made the following transfers to or for the benefit of the Defendants: portions of the Agarwal Family Transfers, the

Ahmed Transfer, the Techsys Transfers, the Depina Transfers (collectively, the "Fraudulent Transfers")[5].

193.     At the time each Fraudulent Transfer was made, defendants Deepak Agarwal, Melina Agarwal, Sheela Agarwal, Vipesh Agarwal, Vishal Agarwal, Iftikar Ahmed, and DIYA Trust were insiders as defined by the Bankruptcy Code.

194.     At all times relevant to the Fraudulent Transfers, during the two years preceding the Debtor's bankruptcy filing, there have been one or more creditors who have held and still hold matured or unmatured unsecured claims against the Debtor.

195.     Those claims against the Debtor were and are allowable under section 502 of the Bankruptcy Code or were and are not allowable only under Section 502(e).

196.     Each of the Fraudulent Transfers constituted a transfer of an interest in property of the Debtor.

197.     Sheela Agarwal and Deepak Agarwal benefited from the DIYA Transfers and/or were the immediate or mediate transferees of such transfers.

198.     Daniel Depina benefited from the Depina Transfers and/or was the immediate or mediate transferee of such transfers.

199.     The Debtor did not receive reasonably equivalent value or fair consideration in exchange for the Fraudulent Transfers.

200.     Defendants received valuable consideration, including without limitation, the Fraudulent Transfers.

201.     At the time the Fraudulent Transfers were made, the Debtor was insolvent in that

---

[5] Herein, the term the "Fraudulent Transfers" refers to the total amount of the transfers from 2012, when the Debtor began to operate, through the Petition Date.

its total liabilities exceeded the fair value of their assets.

202.    Pursuant to 11 U.S.C. § 548(a)(1)(B), the Plan Administrator is authorized to avoid the Fraudulent Transfers.

203.    Based on the foregoing, pursuant to Sections 544(b), 548(b), 550(a), and 551 of the Bankruptcy Code, the Plan Administrator is entitled to a judgment: (a) avoiding and preserving the Fraudulent Transfers made during the six-year period preceding the Petition Date; (b) directing that the Fraudulent Transfers be set aside; (c) recovering the Fraudulent Transfers, or the value thereof, from the respective Defendant for the benefit of the Debtor's estate; and (d) any other relief deemed just and appropriate.

**COUNT THREE**
**Avoidance and Recovery of Fraudulent Transfers with Actual Intent to Defraud – 11**
**U.S.C. §§ 544(b), 548(b), 550 and 551 551 and N.Y. Debtor and**
**Creditor Law § 276, 276-a, 278 and/or 279**
**(Against all Defendants)**

204.    The Plan Administrator repeats and re-alleges the allegations contained in all of the preceding and following paragraphs of this Complaint as if the same were fully set forth herein at length.

205.    During the six years prior to the Petition Date, Defendants caused the Debtor to make the Fraudulent Transfers.

206.    The Fraudulent Transfers were made with actual intent to hinder, delay or defraud creditors of the Debtor.

207.    At the time each Fraudulent Transfer was made, defendants Deepak Agarwal, Melina Agarwal, Sheela Agarwal, Vipesh Agarwal, Vishal Agarwal, Iftikar Ahmed, and DIYA Trust were insiders under the Bankruptcy Code.

208.    At all times relevant to the Fraudulent Transfers, during the two years preceding

the Debtor's bankruptcy filing, there have been one or more creditors who have held and still hold matured or unmatured unsecured claims against the Debtor.

209. Those claims against the Debtor were and are allowable under section 502 of the Bankruptcy Code or were and are not allowable only under Section 502(e).

210. Each of the Fraudulent Transfers constituted a transfer of an interest in property of the Debtor.

211. Sheela Agarwal and Deepak Agarwal benefited from the DIYA Transfers and/or were the immediate or mediate transferees of such transfers.

212. Daniel Depina benefited from the Depina Transfers and/or was the immediate or mediate transferee of such transfers.

213. The Debtor did not receive reasonably equivalent value or fair consideration in exchange for the Fraudulent Transfers.

214. Defendants received valuable consideration, including without limitation, the Fraudulent Transfers.

215. At the time the Fraudulent Transfers were made, the Debtor was insolvent in that its total liabilities exceeded the fair value of their assets.

216. Pursuant to 11 U.S.C. § 548(a)(1)(B), the Plan Administrator is authorized to avoid the Fraudulent Transfers.

217. Based on the foregoing, pursuant to Sections 544(b), 548(b), 550(a), and 551 of the Bankruptcy Code, the Plan Administrator is entitled to a judgment: (a) avoiding and preserving the Fraudulent Transfers made during the six-year period preceding the Petition Date; (b) directing that the Fraudulent Transfers be set aside; (c) recovering the Fraudulent Transfers, or the value

thereof, from the respective Defendant for the benefit of the Debtor's estate; and (d) any other relief deemed just and appropriate.

## COUNT FOUR
### Avoidance and Recovery of Fraudulent Conveyances by Insolvent – 11 U.S.C. §§ 544(b), 550, 551 and N.Y. Debtor and Creditor Law § 273, 278 and/or 279
### (Against All Defendants)

218.    The Plan Administrator repeats and re-alleges the allegations contained in all of the preceding and following paragraphs of this Complaint as if the same were fully set forth herein at length.

219.    Pursuant to Section 544 of the Bankruptcy Code, the Plan Administrator has independent standing to assert each of the Causes of Action in this complaint, which are grounded in NY DCL §§ 273-276.

220.    The Debtor was insolvent at the time that the Fraudulent Transfers were made to Defendants and/or was rendered insolvent due to same.

221.    Sheela Agarwal and Deepak Agarwal benefited from the DIYA Transfers and/or were the immediate or mediate transferees of such transfers.

222.    Daniel Depina benefited from the Depina Transfers and/or was the immediate or mediate transferee of such transfers.

223.    For all the foregoing reasons, pursuant to Sections 544 and 550 of the Bankruptcy Code and NY DCL §§ 273, 278 and/or 279, this Court should enter judgment avoiding the Fraudulent Transfers, and directing each recipient party to turn over the property transferred, or the value thereof, to the Plan Administrator.

## COUNT FIVE
### Avoidance and Recovery of Fraudulent Conveyances by Persons in Business – 11 U.S.C. §§ 544(b), 550, 551 and N.Y. Debtor and Creditor Law § 274, 278 and/or 279
### (Against All Defendants)

224.    The Plan Administrator repeats and re-alleges the allegations contained in all of the

preceding and following paragraphs of this Complaint as if the same were fully set forth herein at length.

225.    As a result of the Fraudulent Transfers, Defendants caused the Debtor to engage or be about to engage in a business transaction for which the property remaining in its hands was an unreasonably small amount of capital.

226.    The Debtor and the Defendants knew, or should have known, that the Fraudulent Transfers would leave the Debtor with minimal capital by which to operate.

227.    Sheela Agarwal and Deepak Agarwal benefited from the DIYA Transfers and/or were the immediate or mediate transferees of such transfers.

228.    Daniel Depina benefited from the Depina Transfers and/or was the immediate or mediate transferee of such transfers.

229.    For all the foregoing reasons, pursuant to Sections 544 and 550 of the Bankruptcy Code, and NY DCL §§ 274, 278 and/or 279 this Court should enter judgment avoiding the Fraudulent Transfers, and directing each recipient party to turn over the property transferred, or the value thereof, to the Plan Administrator.

**<u>COUNT SIX</u>**
**Avoidance and Recovery of Fraudulent Conveyances by Person About to Incur Debts – 11 U.S.C. §§ 544(b) 550, 551 and N.Y. Debtor and Creditor Law § 275, 278 and/or 279 (Against All Defendants)**

230.    The Plan Administrator repeats and re-alleges the allegations contained in all of the preceding and following paragraphs of this Complaint as if the same were fully set forth herein at length.

231.    As a result of the Fraudulent Transfers, the Defendants, and therefore the Debtor, intended or believed that it was going to incur debts beyond its ability to pay as they matured.

232.     The Defendants, and therefore the Debtor, knew, or should have known, the Fraudulent Transfers would leave the Debtor with minimal capital with which to operate.

233.     As a result of the Fraudulent Transfers, the Debtor incurred obligations and or made the Fraudulent Transfers without receiving fair consideration.

234.     Sheela Agarwal and Deepak Agarwal benefited from the DIYA Transfers and/or were the immediate or mediate transferees of such transfers.

235.     Daniel Depina benefited from the Depina Transfers and/or was the immediate or mediate transferees of such transfers.

236.     For all the foregoing reasons, pursuant to Sections 544 and 550 of the Bankruptcy Code and NY DCL §§ 275, 278 and/or 279, this Court should enter judgment avoiding the Fraudulent Transfers, and directing each recipient party to turn over the property transferred, or the value thereof, to the Plan Administrator.

## COUNT SEVEN
### 90-day Preferential Transfers – 11 U.S.C. §§ 544(b), 547, 550, 551
### (Against Deepak Agarwal, Melina Agarwal, Vishal Agarwal, Daniel Depina, and Depina Consulting)

237.     The Plan Administrator repeats and re-alleges the allegations contained in all of the preceding and following paragraphs of this Complaint as if the same were fully set forth herein at length.

238.     At all times relevant to the transfers detailed below, there have been one or more creditors who have held and still hold matured or unmatured unsecured claims against the Debtor.

239.     Those claims against the Debtor were and are allowable under section 502 of the Bankruptcy Code or were and are not allowable only under Section 502(e).

240. Within ninety days of the filing of the Petition, the Debtor made the following transfers to or for the benefit of the following Defendants (hereafter, the "90 Day Preferential Transfers"):

| Transferee / Recipient | 90-day Preferential Transfers |
|---|---|
| Deepak Agarwal | $13,846.15 |
| Vishal Agarwal | $3,846.15 |
| Melina Agarwal | $4,615.20 |
| Daniel Depina / Depina Consulting | $43,440.00 |
| **Total: 90-day Preferential Transfers** | **$65,747.50** |

241. Daniel Depina benefited from the Depina Transfers made during the 90 days prior to Choxi's bankruptcy filing and/or was the immediate or mediate transferees of such transfers.

242. The 90 Day Preferential Transfers constitute transfers of an interest of the debtor in property to or for the benefit of the transferees/recipients, each a creditor of the Debtor.

243. The 90 Day Preferential Transfers were made on account of an antecedent debt owed by the Debtor before the transfers were made.

244. The Debtor was insolvent at the time of the 90 Day Preferential Transfers, and is presumed so under section 547(f) of the Bankruptcy Code.

245. The 90 Day Preferential Transfers enabled the transferee/recipient to receive more than it would have had the transfers not been made, in a case under chapter 7 of the Bankruptcy Code, and/or if the transferee/recipient had received transfers to the extent provided by the provisions of the Bankruptcy Code.

246. Based on the foregoing, pursuant to sections 547(b), 550(a), and 551 of the Bankruptcy Code, the Plan Administrator is entitled to a judgment: (a) avoiding and preserving the 90 Day Preferential Transfers; (b) directing that the 90 Day Preferential Transfers be set aside; (c) recovering the 90 Day Preferential Transfers, or the value thereof, from the recipient Defendant for the benefit of the Debtor's estate; and (d) any other relief deemed just and appropriate.

## COUNT EIGHT
### Insider / One Year Preferential Transfers – 11 U.S.C. §§ 544(b), 547, 550, 551
### (Against Deepak Agarwal, Melina Agarwal, Vishal Agarwal, DIYA Trust, Sheela Agarwal, and Techsys)

247. The Plan Administrator repeats and re-alleges the allegations contained in all of the preceding paragraphs of this Complaint as if the same were fully set forth herein at length.

248. At all times relevant to the transfers detailed below, there have been one or more creditors who have held and still hold matured or unmatured unsecured claims against the Debtor.

249. Those claims against the Debtor were and are allowable under section 502 of the Bankruptcy Code or were and are not allowable only under Section 502(e).

250. Within one year prior to the filing of the Petition, the Debtor made the following transfers to or for the benefit of the following Defendants (hereafter, the "One Year Preferential Transfers," and with the 90 Day Preferential Transfers, the "Preferential Transfers"):

| Transferee / Recipient | One Year Preferential Transfers |
|---|---:|
| Deepak Agarwal | $273,905.94 |
| Vipesh Agarwal | $139,615.41 |
| Vishal Agarwal | $166,142.24 |
| Melina Agarwal | $155,684.17 |
| DIYA Trust (Deepak and Sheela Agarwal) | $400,000.00 |
| Techsys | $1,846,700.00 |
| **Total: One Year Preferential Transfers** | **$2,982,047.76** |

251. Sheela Agarwal and Deepak Agarwal benefited from the DIYA Transfers made during the one year prior to Choxi's bankruptcy filing and/or were the immediate or mediate transferees of such transfers.

252. The One Year Preferential Transfers constitute transfers of an interest of the debtor in property to or for the benefit of the transferees/recipients, each a creditor of the Debtor.

253. The One Year Preferential Transfers were made on account of an antecedent debt owed by the Debtor before the transfers were made.

254. The Debtor was insolvent at the time of the One Year Preferential Transfers in that its liability exceeded the fair value of its assets.

255. The One Year Preferential Transfers enabled the transferee/recipient to receive more than it would have had the transfers not been made, in a case under chapter 7 of the Bankruptcy Code, and/or if the transferee/recipient had received transfers to the extent provided by the provisions of the Bankruptcy Code.

256. Each of the recipients of the One Year Preferential Transfers are an insider of the Debtor under the Bankruptcy Code.

257. Based on the foregoing, pursuant to sections 547(b), 550(a), and 551 of the Bankruptcy Code, the Plan Administrator is entitled to a judgment: (a) avoiding and preserving the One Year Preferential Transfers; (b) directing that the One Year Preferential Transfers be set aside; (c) recovering the One Year Preferential Transfers, or the value thereof, from the recipient Defendant for the benefit of the Debtor's estate; and (d) any other relief deemed just and appropriate.

## COUNT NINE
### Defendants' Liability – 11 U.S.C. §550
### (All Defendants)

258. The Plan Administrator repeats and re-alleges the allegations contained in all of the preceding paragraphs of this Complaint as if the same were fully set forth herein at length.

259. Defendants are the initial, immediate or mediate transferees of the Fraudulent Transfers and Preferential Transfers described herein.

260.    Pursuant to 11 U.S.C. §550(a)(1), the Plan Administrator may recover the Fraudulent Transfers and Preferential Transfers, or the value of the Fraudulent Transfers and Preferential Transfers, from the Defendants as initial, mediate or immediate transferees.

**COUNT TEN**
**Conversion**
**(Against Iftikar Ahmed)**

261.    By his wrongful acts and omissions, Ahmed, personally and/or by and through Oak Investment Partners, wrongfully exercised dominion or control over the property of the Debtor without the Debtor's lawful consent at the expense of and to the detriment of the Debtor by virtue of, for example, the transfer of approximately $10.9 million of the Debtor's Series B funds to Oak Investment Partners' portfolio company, which funds he thereafter absconded with.

262.    As a direct and proximate result of the conversion of Debtor's assets by Ahmed as more fully set forth above, the Debtor sustained damage in the amount of at least $10.9 million.

263.    Ahmed is liable to the Debtor for his wrongful conversion of these funds.

WHEREFORE, the Plan Administrator respectfully requests that the Bankruptcy Court enter judgment in his favor and against Defendants:

a)   finding the D&O Defendants liable for breaching their fiduciary duties to the Debtor, and awarding compensatory damages to the Plan Administrator in an amount to be determined at trial;

b)   declaring that the Fraudulent Transfers (plus the amount of any additional transfers of property of the Debtor to any of the Defendants during the two years preceding the Petition Date that discovery may reveal) constitute avoidable fraudulent transfers pursuant to Section 548 of the Bankruptcy Code;

c)   declaring that the Fraudulent Transfers (plus the amount of any additional transfers of property of the Debtor to any of the Defendants during the six years preceding the Petition Date that discovery may reveal) constitute avoidable fraudulent transfers pursuant to Section 544(b) of the Bankruptcy Code and Sections 276, 276-a, 278 and/or 279 of the NY DCL;

d)   (i) avoiding the Fraudulent Transfers (plus the amount of any additional transfers of property of the Debtor to any of the Defendants that discovery may reveal), (ii)

directing and ordering that Defendants return to the Plan Administrator, pursuant to Section 550 of the Bankruptcy Code, the full value of, and awarding judgment against Defendants in an amount equal to the Fraudulent Transfers (plus the amount of any additional transfers of property of the Debtor to any of the Defendants), (iii) requiring Defendants to immediately pay to the Plan Administrator pre-judgment and post-judgment interest from the date the Fraudulent Transfers (plus the amount of any additional transfers of property of the Debtor to any of the Defendants that discovery may reveal) were made through the date of the payment at the maximum legal rate; and (iv) awarding the Plan Administrator costs incurred in this suit;

e) declaring that the 90 Day Preferential Transfers (plus the amount of any additional 90 day transfers of property of the Debtor to any of the Defendants during the 90 days preceding the Petition Date that discovery may reveal) constitute avoidable preferential fraudulent transfers pursuant to Section 547 of the Bankruptcy Code;

f) declaring that the One Year Preferential Transfers (plus the amount of any additional transfers of property of the Debtor to any of the insider Defendants during the one year preceding the Petition Date that discovery may reveal) constitute avoidable preferential fraudulent transfers pursuant to Section 547 of the Bankruptcy Code;

g) (i) avoiding the Preferential Transfers (plus the amount of any additional preferential transfers of property of the Debtor to any of Defendants that discovery may reveal), (ii) directing and ordering that Defendants return to the Plan Administrator, pursuant to Section 550 of the Bankruptcy Code, the full value of, and awarding judgment against Defendants in an amount equal to the Preferential Transfers (plus the amount of any additional preferential transfers of property of the Debtor to any of the Defendants), (iii) requiring Defendants to immediately pay to the Plan Administrator pre-judgment and post-judgment interest from the date the Preferential Transfers (plus the amount of any additional preferential transfers of property of the Debtor to any of the Defendants that discovery may reveal) were made through the date of the payment at the maximum legal rate; and (iv) awarding the Plan Administrator costs incurred in this suit;

h) if any of the Defendants have an existing claim, then disallowing such existing claim pursuant to Sections 502(d) and 502(j) of the Bankruptcy Code until such time as (i) such Defendant turns over to the Plan Administrator any property deemed recoverable pursuant to Section 550 of the Bankruptcy Code, and/or (ii) such Defendant has paid the amount for which such Defendant is liable pursuant to Section 550 of the Bankruptcy Code; and

i) finding defendant Iftikar Ahmed liable for conversion, and awarding compensatory damages to the Debtor's estate in an amount to be determined at trial; and

j) awarding the Plan Administrator such other and further relief as may be just and proper.

Dated: December 4, 2018

By: /s/   Dana S. Katz
**Fox Rothschild LLP**
William H. Stassen (*Pro Hac Vice To Be Filed*)
Dana S. Katz
101 Park Avenue, 17th Floor
New York, New York 10017
(212) 878-7900
wstassen@foxrothschild.com
dkatz@foxrothschild.com

*Attorneys for Tracy Klestadt, Plan Administrator of the bankruptcy estate of Choxi.com, Inc.*